**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| MARYANNE BROGAN on behalf | : | |
| of herself and all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **DEMAND FOR JURY TRIAL** |
| | : | |
| HYUNDAI MOTOR AMERICA; | : | |
| KIA MOTORS AMERICA, INC.; | : | |
| HYUNDAI MOTOR COMPANY | : | |
| KIA MOTORS CORPORATION | : | |

Defendants.

## CLASS ACTION COMPLAINT

Plaintiff, Maryanne Brogan ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendants, Hyundai Motor America ("HMA"), Kia Motors America, Inc. ("KMA"), Hyundai Motor Company ("HMC") and Kia Motors Corporation ("KMC") (collectively, "Defendants") by and through her attorneys.  Plaintiff asserts the claims alleged herein upon knowledge as to her own acts and otherwise upon information and belief as follows:

## INTRODUCTION

1.      This action seeks damages and injunctive relief for Defendants' violation of the California Unfair Competition Law (Business and Professions Code § 17200, *et seq.*), the California Act regarding False or Misleading Statements (Cal. Civ. Code § 17500 *et seq.*), and the California Consumers Legal Remedies Act (Cal. Civ. Code § 1740, *et seq.*), and, alternatively, New York's general business laws, together with claims for fraud, negligent misrepresentation, breach of contract, unjust enrichment, and declaratory judgment.

2.      Plaintiff's claims arise from Defendants' defective design of 2.0-liter GDI turbo-charged engines and 2.4-liter GDI engines (the "Theta II" engines, defined below) found in certain model year 2011 through 2016 Kia and Hyundai vehicles (the "Class Vehicles" defined below).[1]

3.      Each of the Class Vehicles are equipped with a Theta II engine.  For the reasons stated below, the Theta II engines are defectively designed (the "Engine Defect" or "Defective Engine") and the Engine Defect is common to all Class Vehicles.

4.      Despite their longstanding knowledge, Defendants failed to disclose to Plaintiff and similarly situated consumers that the Engine Defect can result in restricted engine lubrication, including oil flow to connecting rod bearings, as well as to other vital areas of the engine. This defect can cause the Theta II engines to lose power, make noise, develop engine knock, misfire and/or stall.

5.      Significantly, restricted oil flow within the engines poses a safety risk to the operator and passengers of the Class Vehicles. The failure to have sufficient engine lubrication can ultimately result in complete and catastrophic engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speed. This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death. As discussed further herein, numerous owners and lessees of the Class Vehicles have experienced engine damage and catastrophic failure while operating Class Vehicles, thus placing themselves and those around them in immediate danger.

---

[1] Class Vehicles are defined to include Kia and Hyundai vehicles incorporating the Theta II engine that have not yet been recalled for the Engine Defect alleged herein based on currently available information.  However, Plaintiff reserves the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles after conducting discovery.

6.     Defendants have long been aware of the defect described herein. Yet, Defendants have routinely refused to repair the Class Vehicles without charge when the defect manifests. Indeed, in many cases Defendants have even refused to disclose the existence of the defect when Class Vehicles displaying symptoms consistent with the defect are brought in for service, instead choosing to ignore the defect until it has caused significant mechanical problems necessitating costly repairs.

7.     Not only did Defendants actively conceal the fact that particular components within the Class Vehicles' engines are prone to failure, they did not reveal that the existence of the defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns described herein.

8.     Many other owners and lessees of the Class Vehicles have communicated with Defendants and/or their agents to request that Defendants remedy and/or address the Engine Defect and/or resultant damage at Defendants' expense. However, Defendants have routinely failed to do so even within the warranty period, often blaming the owners for failing to properly maintain the vehicle rather than admit that the engine's failure is the result of Defendants' own misconduct.

9.     Defendants have also refused to take any action to correct this concealed Engine Defect when it manifests in the Class Vehicles outside of the warranty period. Because the Engine Defect can manifest shortly outside of the warranty period for the Class Vehicles – and given Defendants' knowledge of this concealed, safety related Engine Defect – Defendants' attempt to limit the warranty with respect to the Engine Defect is unconscionable and unenforceable.

10.     Despite notice and knowledge of the Engine Defect from the numerous complaints they have received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and their own internal records, including durability testing, Defendants have not recalled the Class Vehicles to repair the Engine Defect, offered their customers suitable repairs or replacements free of charge, offered to reimburse their customers who have incurred out-of-pocket expenses to repair the Engine Defect, or offered to reimburse many customers for the fact that the Engine Defect has diminished the intrinsic value of the Class Vehicles.

11.     Had Plaintiff and other Class Members known of the Engine Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

12.      Based on information and belief, Plaintiff alleges that as the number of complaints increased, and as Class Members grew dissatisfied with the performance of the Class Vehicles, Defendants were forced to begrudgingly acknowledge that "some" Class Vehicles suffer from an inherent defect.

13.     As a result of the Engine Defect, and as a result of Defendants' unfair, deceptive and/or fraudulent business practices, Plaintiff and the Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

14.     Accordingly, Plaintiff brings this action to redress Defendants' violations.

## **JURISDICTION**

15.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1332(a) and (d) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of

interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over Plaintiff, Maryanne Brogan because she resides in this district and because she submits to the Court's jurisdiction.

## VENUE

17.     Venue is proper in this district because many of the critical acts relating to Plaintiff's claim took place in this district including, but not limited to, Plaintiff's purchase of a 2016 Kia Optima and the catastrophic failure of the engine in the vehicle.

18.     Venue is also proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants transact business in this district and are subject to personal jurisdiction in this district. Additionally, there are one or more authorized Kia dealers and Hyundai dealers within this district, and Defendants, including HMA and KMA, have advertised in this district and have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district; therefore, significant events and/or omissions giving rise to the claims occurred, in part, within this district.

19.     Further Venue is proper in this District under 28 U.S.C. § 1391(c)(3) because HMC and KMC, as "defendant[s] not resident in the United States may be sued in any judicial district." Accordingly, because HMA and KMA are subject to jurisdiction in this District, because Defendants transact business within this District, and because a significant part of the events establishing Plaintiff's claim arose in this District, venue is proper.

## PARTIES

20.     Maryanne Brogan is a citizen of the State of New York and currently resides at 4 Timberwood Place, South Salem, New York 10540.  On or about May 23, 2016, Plaintiff purchased a new 2016 Kia Optima EX (VIN 5XXGU4L37GG058714) from Kia of White Plains located in New York.

21.     Defendant Hyundai Motor America ("HMA") is a California corporation with its national headquarters at 10550 Talbert Ave. Fountain Valley CA 92708.  HMA is a subsidiary of Defendant Hyundai Motor Company.  At all times, HMA was actively involved, from its facilities and also from the Irvine, California Hyundai & Kia California Design & Technical center, in designing, manufacturing, assembling, marketing, distributing and selling Hyundai vehicles sold in the United States.

22.     Defendant Kia Motors America ("KMA") is a California corporation with its national headquarters 111 Peters Canyon Rd, Irvine, CA 92606.  KMA is a subsidiary of Defendant Kia Motors Corporation.  KMA operates out of its headquarters in Irvine, California and has a design center in Irvine.  At all times, KMA was actively involved in designing, manufacturing, assembling, marketing, distributing, and selling Kia vehicles sold in the United States.

23.     Hyundai Motor Company ("HMC") is a Korean corporation with headquarters located at 12 Heolleung-ro, Seocho-Gu, Seoul, South Korea.  HMC is the parent corporation of HMA.  HMC also owns a 33.88% stake in Defendant Kia Motors Corporation.

24.     Kia Motors Corporation ("KMC") is a South Korean corporation with headquarters located at 12, Heolleung-ro, Seocho-Gu, Seoul, South Korea.  KMC is the parent of KMA.

25.     Defendants are automobile design, manufacturing, distribution, and/or service corporations doing business within the United States. Furthermore, Defendants design, develop, manufacture, distribute, market, sell, lease, warrant, service and repair passenger vehicles, including the Class Vehicles.

26.     KMA is headquartered in Irvine, California.  KMA is the sales, marketing, and distribution arm for all of Kia's United States operations.  According to its website, KMA's corporate headquarters is a $130 million, custom-built facility that houses the KMA U.S. sales division, and its marketing, public relations, consumer affairs, technical service, research and development, product planning, and administration department.  The Irvine, California facility is also home to the state-of-the-art Kia Design Center America, a 236,000 square feet campus on 21.7 acres.

27.     KMA shares the same proving grounds as HMA in California City, California. According to its website, the California proving ground is where "performance and endurance tests are conducted on all Kia vehicles sold in the US and locally developed parts."

28.     Upon information and belief, decisions regarding the Theta II Engine as it relates to the Engine Defect within the Class Vehicles, including design, distribution, installation, service and repair of the Theta II engines, were performed exclusively by Defendants.

29.      Upon information and belief, Defendants developed the post-purchase owner's manuals, warranty booklets, and information included in maintenance recommendations and/or schedules for the Class Vehicles.

30.     Based upon information and belief, Plaintiff alleges that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and was acting within the course and scope of said agency and/or employment with

the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and/or ratified by, each of the other Defendants

31.     Plaintiff has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Engine Defect, including but not limited to, out of pocket losses associated with the Engine Defect, diminished value of her vehicle and other consequential damages.

32.     Neither Defendants nor any of their agents, dealers or other representatives informed Plaintiff of the existence of the Engine Defect prior to, or any time after, her purchase.

## FACTUAL ALLEGATIONS

33.     On or about October 22, 2017, while driving on the highway, Plaintiff's son, Connor Brogan, began to hear an unusual engine noise.  Almost immediately after first hearing the unusual engine noise, the vehicle stopped and began to catch on fire.

34.     The vehicle suffered significant fire damage and is beyond repair.

35.     At the time of the incident Plaintiff's vehicle had been driven 22,138 miles.

36.     An investigation after the incident revealed the immediate cause of the engine malfunction was that a connecting rod became detached from the crankshaft and pierced a hole through the engine block, allowing hot engine oil to escape and ignite when it came in contact with the exhaust manifold or other hot surfaces in the engine bay.

### A.     The Defective Engine Components within the Class Vehicles

37.     KMC, one of the leading motor vehicle manufacturers in Korea, was established in December 1944 under the laws of the Republic of Korea to manufacture and sell a range of passenger cars, recreational vehicles and other commercial vehicles in the domestic and

international markets.  As of December 31, 2016, KMC's largest shareholder is HMC, which

holds 33.88 percent of KMC's stock.[2]

38.     HMC is a multinational corporation with over 75,000 employees worldwide.

HMC is currently the fourth largest automobile manufacturer in the world.

39.     KMA is the American sales, marketing, and distribution arm of KMC.  KMA

offers a complete line of vehicles through more than 755 dealers throughout the United States.

40.     On information and belief, HMC builds the Theta II 2.4 liter 4-cylinder Gasoline

Direct Injection and Theta II 2.0 liter 4-cylinder Gasoline Direct Injection Turbo engines.

Accordingly, certain Theta II Engines, which KMC and KMA used in the Class Vehicles, were

manufactured by HMA and/or HMC.

### 1.     The Theta II Engines

41.      In the fall of 2010, Defendants announced that they had developed a new family

of engines, the "Theta II" engines, for use in midsized vehicles.  The Theta II engines include

two principal variations, a 2.0-liter GDI turbo and a 2.4-liter GDI without turbo.

42.     Defendants installed the Theta II engines in several model vehicles including, but

not limited to the following models:

   a.   2011 – 2016 Hyundai Sonata;

   b.   2013 - 2016 Hyundai Santa Fe;

   c.   2011 – 2016 Kia Optima;

   d.   2012 – 2016 Kia Sportage; and

   e.   2014 – 2016 Kia Sorrento

---

[2] *See* 2016 Annual Report, pg. 67 (available at
http://www.kia.com/worldwide/about_kia/investor_relations/annual_report.do (last visited January 5, 2018)).

43.     The Theta II engines are internal combustion engines that use four reciprocating pistons to convert pressure created by burning gasoline mixed with air in the combustion chambers of the engine into a rotating force. To generate such rotating motion, a four-step sequence is used (the "Combustion Cycle"). First, the intake stroke begins with the inlet valve opening and, as air is pulled into the combustion chamber, atomized fuel is sprayed directly into the combustion chamber. Second, the compression stroke begins when the inlet valve closes and the piston moves upward, compressing the air-fuel mixture. Third, the power stroke begins when the spark plug ignites the air-fuel mixture.  The resulting rapid heating of the gas creates extreme pressure forcing the piston down.  The downward force on the piston is transmitted to the crankshaft. Fourth, the exhaust stroke begins with the exhaust valve opening.  As the piston is pushed back up, it forces the exhaust gases out of the cylinder.

44.     The pistons are connected to the crankshaft via the connecting rod.  The connecting rod moves up and down during the Combustion Cycle, this causes the crankshaft to rotate, ultimately transmitting power to the drive wheels of the vehicle.  During this process, the crankshaft can rotate and the connecting rods can reciprocate up and down thousands of times per minute.  In order to reduce friction and prolong longevity, a bearing is placed between the connecting rod and crankshaft surfaces.  As a result, the connecting rod bearings allow the crankshaft to rotate within the connecting rods during the Combustion Cycle.





**Diagram 1A:** assembled generic connecting rod, including rod bearings. The big end of the connecting rod is bolted around the crankshaft with the bearing inserts reducing friction as the reciprocating longitudinal force of the connecting rod is converted into rotational force.

**Diagram 1B:** exploded view of generic connecting rod and related components including bearing shells that form a low-friction, well-lubricated surface between the connecting rod and the crankshaft, allowing the crankshaft to revolve freely.

45.     When the Class Vehicles are in operation, engine oil is used to lubricate the piston, cylinder wall, crankshaft, connecting rod bearings and other rotating and moving components as the piston moves up and down through the four-stroke sequence. Engine oil is necessary to reduce wear on moving parts throughout the engine (including the connecting rod bearings, *See* Diagram 2), improve sealing, and cool the engine by carrying away heat from the moving parts. Engine oil also cleans and transports contaminants away from the engine to the engine oil filter. Oil is pumped and pressurized throughout the engine by the oil pump. The oil pump draws oil from the oil pan, located underneath the piston and crankshaft. The oil pump

forces engine oil through the oil filter and then through passages in the engine to properly

lubricate and reduce friction in internal moving engine components. The oil then returns to the

oil pan through small drainage holes located throughout the engine where it will be recirculated

by the oil pump.



**Diagram 2:** example of machined small oil passages in a generic crankshaft, allowing for necessary lubrication of connecting rod bearings

46.      The Theta II engines incorporated several new design technologies that put new

stresses on the engine's lubrication system.

47.      Theta II engines use gasoline direct injection ("GDI") technology to directly spray

fuel into the combustion chamber.  This is a change from prior engines used by the Defendants

that employed multiport fuel injection technology ("MPFI" or "MPI"), also known as "port

injection."  In an MPFI system, each of the individual intake runners has its own injector that

adds a squirt of aerosolized fuel to the intake air.  The air and fuel mixture are then drawn into

the open port and into the combustion chamber by the retreating piston.

48.     In order to ensure proper atomization of fuel, the GDI system incorporates a high-pressure fuel system to spray the fuel directly into the combustion chamber at injection pressures as high as 2,175 psi (150 bar).

49.     By using GDI technology, the Theta II engines are able to increase the compression ratio over the engines that the Theta II engines replaced from 10.5:1 to 11.3:1.  The increased compression ratio means that the engines generate more Thermal Stress (heat) and more "blow-by."

50.     GDI engines also burn leaner than port fuel injection engines, operating at a 40:1 versus 14.7:1 air-to-fuel ratio. This leaner mixture results in more conservative fuel usage but contributes to much hotter engine operating temperatures.

51.     The Theta II engines also included a piston cooling jet attached to the main oil gallery on the cylinder block that cools the piston by spraying a mist of engine oil onto each overhead piston.  This feature also results in increased oil temperatures and contributes to more engine oil being atomized into the crankcase gasses.

52.     The use of a high pressure GDI system and higher compression ratios increases the likelihood of fuel dilution and contamination of the engine oil as a result of blow-by in the Theta II engines.

53.     Both KMA and HMA advertised the quality of the new Theta II engines.  KMA and KMC advertise that "[I]t's the Gasoline Direct Injection engine that helps a Kia deliver outstanding performance-in both power and fuel use. GDI injects highly-pressurized fuel directly into the cylinders during the engine's combustion cycle. The result is an increased quality of combustion and efficiency. By making smarter use of fuel, GDI also reduces emissions. What

the driver experiences is still the most critical element of any powertrain technology. And with GDI, the driver enjoys smooth, powerful acceleration and a longer time between refueling."

54.     Hyundai has also made similar public statements regarding the design of the GDI engine: "[t]his shorter, more direct path of fuel delivery, allows for greater control of the fuel mixture at the optimum moment, thus improving efficiency. The fuel is injected by a camshaft-driven, high pressure pump that operates at pressures up to 2,175 psi. Direct injection also utilizes a higher than normal 11.3:1 compression ratio for increased power. The pistons are 'dished' to increase combustion efficiency in the cylinder. This powerplant delivers best-in-class fuel economy, best-in-class four-cylinder horsepower and best-in-class torque."

### 2.     Previous Theta II Engine Recalls

55.     On or about September 20, 2015, HMA issued a safety recall for approximately 470,000 model year 2011-2012 Sonata vehicles manufactured between December 11, 2009 and April 12, 2002 at Hyundai Motor Manufacturing Alabama and equipped with the 2.4L and 2.0T Theta II Engines (the "Hyundai GDI Recall")[3].

56.     According to the Hyundai GDI Recall, HMA determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during December 11, 2009, to April 12, 2012.  As a result, and according to the Hyundai GDI Recall:

> [i]f the debris is not completely removed from the crankshaft's oil passages, it can
> be forced into the connecting rod oiling passages restricting oil flow to the
> bearings.  Since bearings are cooled by oil flow between the bearing and journal,
> a reduction in the flow of oil may raise bearing temperatures increasing the
> potential of premature bearing wear.  A worn connecting rod bearing will produce
> a metallic, cyclic knocking noise from the engine which increases in frequency as
> the engine rpm increases.  A worn connecting rod bearing may also result in
> illumination of the oil pressure lamp in the instrument cluster.  If the vehicle

---

[3] *See* https://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM486679/RCAK-15V568-8864.pdf (last visited January 5, 2018).

continues to be driven with a worn connecting rod bearing, the bearing can fail,
and the vehicle could stall while in motion.[4]

57.     HMA went on the explain, in Safety Recall Report 15V-568, that it became aware
of engine-related warranty claims in the field. Furthermore, "[t]he vast majority of those claims
evidenced that customers were responding to substantial noise, or the vehicle's check engine
light, and bringing their vehicles to service as a result of those warnings. Many customers also
complained after the warranty was no longer available."[5]

58.     In April 2017, HMA and KMA announced that they were recalling an additional
1.4 million vehicles with the Theta II engines because they received widespread reports that the
engines could fail and stall, *i.e.* the same reason for the first recall. This recall included the 2013-
2014 Hyundai Santa Fes, 2011-2014 Kia Optimas, 2011-2013 Kia Sportages and 2012-2014 Kia
Sorentos.

59.     The Class Vehicles have not been recalled despite having the same Theta II
engine and despite the fact that Plaintiff and Members of the Class have notified Defendants
about their engines stalling and failing while being operated.

### 3.     Engine Failures within the Class Vehicles

60.     As explained above, engines are designed to have oil distributed throughout the
engine through lubrication channels. When operating properly, the engine oil is distributed
throughout the engine by the oil pump and then flows back to the oil pan where it is redistributed
throughout the engine.  As a result of the defect, the Class Vehicles suffer from restricted and
inadequate engine oil lubrication.

---

[4] *See* https://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM486031/RCLRPT-15V568-9490.PDF (last
visited January 5, 2018).
[5] *See Id.*

61.     In the Class Vehicles, the lubrication channels become clogged and restricted as a result of the Engine Defect, even under normal use and proper maintenance. When the lubrication channels clog, engine oil is unable to be both pumped throughout the engine (through the oil pump) and is also unable to adequately return to the oil pan, causing a condition known as oil starvation. This results in insufficient lubrication throughout the Class Vehicle's engine, which causes premature wear of the engine components and catastrophic engine failure.

62.     Upon information and belief, the connecting rod bearings in the Theta II Engines undergo a prolonged failure as metal debris circulates throughout the engine via the engine oil. Over time, and as a result of insufficient lubrication due to oil contamination, the connecting rod bearings begin to fracture. Once the connecting rod bearings fracture, large amounts of metal debris begin to accumulate in the engine oil. As a result, the engine oil filter becomes so contaminated with metal debris that the oil filter becomes clogged.  Excessive pressure then builds up in the oil filter, causing the oil filter bypass valve to open, allowing unfiltered contaminated oil to recirculate throughout the engine, causing even more damage to the various engine components.   **(See Diagram 3)** This eventually results in sudden and unexpected catastrophic engine failure. If the vehicle is being operated on the highway at the time of the engine failure, it may ultimately result in a high-speed stalling event.



**Diagram 3**: Generic diagram of bypass filter operation.  Left shows oil flow in proper functioning filter, oil from crankcase is forced through filter medium before circulating through engine.  Right

shows bypass valve opened when filter medium is clogged,
excessive oil pressure opens bypass valve allowing unfiltered oil to
circulate through engine.

63.     Additionally, as the connecting rod bearings continue to fracture, the acceptable

tolerances between the bearings, the connecting rod, and the crankshaft rapidly deteriorate.

Eventually, the Class Vehicles may begin producing a "knocking" sound originating from the

engine as a result of the deteriorating bearings. In some instances, as was the case in Plaintiff's

vehicle, the defective connecting rod bearings may eventually cause the piston and rod assembly

to break through the engine block as a result of the deterioration.  In this type of catastrophic

failure, the crankcase oil leaks out through the fractured engine block. The hot engine can ignite

the leaking engine oil causing a vehicle fire.

64.     The Engine Defect poses serious safety and security issues for operators and

occupants of the Class Vehicles.  By way of example, the California Department of Motor

Vehicles asserts that stalled engines pose a significant safety risk and, as part of its safety

curriculum, instructs how to properly respond to a stalled action in order to avoid further risk of

injury.

65.     NHTSA takes a similar view of engine failure during vehicle operation. For

instance, according to Forbes, in 2011, NHTSA recalled certain Chrysler and Dodge vehicles due

to "engine seizure because of connecting rod bearing failure" and noted that  "Engine seizure

could increase the risk of a crash."[6]

66.     Defendants failed to adequately research, design, test, and/or manufacture the

Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class

Vehicles as suitable and safe for use in an intended and/or reasonably foreseeable manner.

---

[6] http://www.forbes.com/sites/altheachang/2011/09/30/engine-problems-prompt-chrysler-recalls/ (last visited
January 5, 2018).

**B.**   **Defendants' Knowledge of the Engine Defect**

67.    Plaintiff's experience is by no means an isolated or outlying occurrence. Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the same Engine Defect regarding Kia and Hyundai vehicles containing Theta II engines.  Upon information and belief, Defendants knew or should have known of the Theta II Engine Defect and the unreasonably high rate of Theta II engine failures as a result of: (1) their design expertise; (2) their own internal durability testing; (3) their records of customers' complaints; (4) their dealership repair records, (5) records from the National Highway Traffic Safety Administration ("NHTSA"); (6) warranty and post-warranty claims; and (7) other various sources.  Nonetheless, Defendants failed to notify consumers of the nature and extent of the problems with the Theta II Engines or provide any adequate remedy.

68.    Defendants knew or should have known about the Theta II Engine Defect even before marketing the Theta II engines.  Because of their longstanding involvement in the design and manufacture of internal combustion engines, Defendants were aware of feasible means and technology to design and manufacture Theta II engines for Class Vehicles without the substantial propensity to suffer a lubrication failure.

69.    As a result of their design expertise and as a result of accepted industry standards and practices, Defendants also knew or should have known that the Theta II engines in Class Vehicles were "hot running" and that the Thermal Stress produced by the engines would accelerate the degradation of conventional motor oil and could lead to engine failure.

70.    Defendants knew or should have known of the Design Defect as a result of subjecting the engines to proper testing.  Defendants claimed that they conducted "durability tests" which included running the Theta II engines on a dynamometer for 300-hour durability

cycles.  However, these tests were not sufficient to disclose the engines' inherent risks for premature failure.

71.     Defendants also should have known of the connecting rod bearing defect and insufficient lubrication because of the number of reports of engine problems relating to the connecting rod bearings and/or lubrication system. For instance, Defendants' customer relations departments, which interact with Kia-authorized and Hyundai-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of engine problems relating to the connecting rod bearings and lubrication channels. Defendants' customer relations also collect and analyze field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

72.     Defendants' warranty department similarly reviews and analyzes warranty data submitted by their dealerships and authorized technicians in order to identify defect trends in their vehicles. Defendants dictate that when a repair is made under warranty (or warranty coverage is requested), service centers must provide them with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Defendants later decide to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Defendants because Defendants will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

73.     Upon information and belief, Defendants regularly monitor NHSTA databases as part of its ongoing obligation to identify potential defects in its vehicles.  NHTSA complaints

establish that Defendants knew, or should have known, of the Engine Defect at least as early as June 14, 2013, years before the Class Vehicles at issue in this litigation were sold.

74.     In fact, as of February 2012, KMA and KMC issued a technical service bulletin ("TSB") to its authorized dealerships regarding an engine knocking noise. TSBs are documents used by automotive manufacturers to inform dealership technicians about new information, including vehicle problems, new repair procedures, and improved parts. In TSB No. ENG114R1, KMA and KMC acknowledged that the earlier model years of the Class Vehicles with identical engines were defective and experienced a "knocking noise." As a result, KMA and KMC directed dealers to blame the Engine Defect on the use of aftermarket oil filters and instructed the dealers to replace the aftermarket oil filter with a genuine Kia oil filter. The TSB also explained that this "repair" is not covered under warranty.  In other words, KMA and KMC attempted to circumvent their warranty obligations and conceal the true nature of the Engine Defect by faulting customers for use of an aftermarket oil filter. However, the defective connecting rod bearings and the defective oil lubrication system are not caused by the use of an aftermarket engine oil filter.

75.     As opposed to issuing recall notices to users of Class Vehicles, or otherwise advising consumers of the Design Defect, Defendants continued to manufacture and distribute the Class Vehicles with actual knowledge that the Theta II engines in these vehicles were malfunctioning and not fit for their intended purpose.  The Defendants continued to place the Class Vehicles into the stream of commerce with actual knowledge that the Theta II engines could fail and place vehicle operators at risk of death as a result of the Engine Defect.

76.     The Engine Defect of the Theta II engines in the Class Vehicles is not a matter that is known to the general public.  The information is technical in nature and the causal

relationship to engine failure, is not apparent to the ordinary consumer.  The dissemination of such information, which is proprietary, is exclusively within the control of the Defendants.

### C.   KMA's Warranty-Related Practices

77.   KMA and KMC issued two relevant warranties with each Class Vehicle: a "New Vehicle Limited Warranty," and a "Powertrain Warranty."

78.   Under the basic New Vehicle Limited Warranty, KMA and KMC agreed to repair defects reported within the earlier of 5 years or 60,000 miles.

79.   Under the Powertrain Warranty, KMA and KMC agreed to repair defects affecting various powertrain components through 10 years and 100,000 miles. According to the Warranty and Consumer Information Manual, Powertrain Coverage Components include:

> **In the Engine:** Cylinder block, cylinder head and all internal parts, timing gear, seals and gaskets, valve cover, flywheel, oil pump, water pump and turbo charger.
> **In the Transaxle:** Transmission case and all internal parts, torque converter, drive shafts, universal joints, front hubs, bearings, seals and gaskets.
> **In the Transmission:** Transmission case, transfer case, torque converter and all internal parts, seals, and gaskets.[7]

80.   Defendants instruct vehicle owners and lessees to bring their vehicles to a Kia or Hyundai dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to Kia or Hyundai dealerships with complaints related to the Engine Defect.

81.   KMA and KMC have evaded their warranty obligations by failing to tell consumers that their vehicles are defective and by representing that the cause of the defect is the owner's neglect to properly maintain the engine oil and/or engine oil level or their use of

---

[7] *See*  https://www.kia.com/us/k3/content/media/all/warranty/2016_warranty.pdf (2016 Kia Warranty and Consumer Information Manual, last visited January 19, 2018).  HMA and HMC offered functionally identical warranty coverage for Hyundai Class Vehicles.  *See* https://m.hyundaiusa.com/assurance/AME-ALL15MY-140513.pdf (2015 Hyundai warranty manual, last visited January 19, 2018).

aftermarket filters. This representation, however, is false as the engine is inherently defective and will inevitably fail.

82.     In addition, Defendants have also evaded their warranty obligations by requiring consumers to produce the entire maintenance history of the Class Vehicles, including a mandate that all oil changes be completed at a Kia or Hyundai dealership, before determining whether to make the necessary repairs under warranty.  However, Defendants know that the defect in the Class Vehicles' engines manifests even if the owner or lessee has followed the Defendants' oil change guidelines.  Moreover, even if consumers produce their vehicles' maintenance history, Defendants may still blame the engine failure on the consumer, refusing to cover the necessary repairs under warranty, and charging as much as $10,000 to repair/replace the engine.

83.     In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the defect (despite such defect having been contained in the Class Vehicles when manufactured by Defendants), repair and replacement of the Theta II Engine, and the unnecessary and premature replacement of the connecting rods, crank shaft, oil pump, and other engine components.

84.     Defendants have concealed the Design Defect because the information is material to the decision whether to purchase one of their vehicles.  This deceptive practice has occurred in spite of the legal and equitable duties imposed on the Defendants to inform vehicle owners and prospective purchasers of the Engine Defect.  Defendants knowingly and intentionally concealed material information about the Design Defect with the intent that Plaintiff and the Class members would rely on the concealment and purchase the Class Vehicles.

85.     In August 2016, Kim Kwang-Ho, an engineer who has worked for HMC for 25 years and was most recently working as a manager for HMC's quality control team, filed a

complaint with the NHTSA regarding Theta II engine malfunctions.  The complaint alleged that Hyundai cars carrying the Theta II engines have problems with noise and sudden loss of power. The veteran engineer said he took the case to the NHTSA because the company did not take action after he raised the issue with a compliance officer, stating in an on-line post: "I had a meeting with Otto Matheke, a director at the U.S. National Highway Traffic Safety Administration.  I asked him to examine the company thoroughly because it is not fixing its illegal practices."

86.     Despite the recent disclosures of its own employee, Defendants have continued to deny the problems with the Theta II engines and have taken affirmative steps to conceal defects related to the Theta II engines.  In particular, Hyundai has taken steps to silence Mr. Kwang-Ho from disclosing defects with the Theta II engines.  In October, 2016, Hyundai filed a petition with the Seoul Central District Court, asking it to stop Kim Kwang-Ho from leaking "secret information." Hyundai also took Mr. Kwang-Ho before the company's disciplinary committee.

**DEFENDANTS' AFFIRMATIVE DUTY TO DISCLOSE**

87.     In light of the facts and circumstances, including but not limited to the safety risk resulting from the Engine Defect in the Theta II engines of Class Vehicles and the damage to the Theta II engines as a result of the Engine Defect, Defendants had an affirmative duty to disclose the true facts relating to the Engine Defect and associated safety risks to purchasers and users of Class Vehicles and to the general public.

88.     The information the Defendants wrongfully suppressed and concealed was material to actions by Class members, including their decisions to purchase Class Vehicles.

89.     Plaintiff and Class members had a reasonable expectation that the Defendants would design, manufacture, market, and distribute the Class Vehicles without the Theta II

Engine Defect and without serious and significant safety risks and hazards.  Plaintiff and the

Class members also had a reasonable expectation that the Defendants would design,

manufacture, market, and distribute Class Vehicles with a reasonable useful life and reasonable

value undiminished by the Theta II Engine Defect.

90.    Any applicable statute(s) of limitations have been tolled by Defendant's knowing

and active concealment and denial of the facts alleged herein. Plaintiff and the members of the

Class could not have reasonably discovered the true, latent nature of the Engine Defect until

shortly before this class action litigation was commenced.

91.    In addition, even after some Class Members contacted Defendants KMC, HMC

and/or their authorized dealers for vehicle repairs concerning the Engine Defect, they were

routinely told by Defendants and/or through their dealers that the Class Vehicles were not

defective. However, as described herein, the true cause of the premature and catastrophic failure

in the Class Vehicles is the Engine Defect that results in restricted oil flow.

## AGENCY, DIRECTION, CONTROL AND RATIFICATION BY THE KOREAN DEFENDANTS

92.    Plaintiff alleges, on information and belief, that both the "Foreign Defendants"

(HMC and KMC) and the "Domestic Defendants" (HMA and KMA) acted together, jointly and

in concert, with respect to:

a.   The defective design of the Theta II engines; and

b.   The material misrepresentations and omissions related to the design defect of the

Theta II engines found in the Class Vehicles.

93.    Plaintiff further alleges that the Foreign Defendants have affirmatively directed

and controlled the wrongful actions of the Domestic Defendants and/or have ratified the

wrongful actions of the Domestic Defendants.  Accordingly, the Foreign Defendants are liable, jointly and severally, for all of the wrongful actions of the Domestic Defendants.

94.     The Foreign Defendants' unfair and deceptive conduct had the foreseeable, proximate, and actual effect of injuring Plaintiff and Class members.

95.     As a result of the domination, direction, and control of the Domestic Defendants by the Foreign Defendants, the Foreign Defendants are liable for the wrongful acts of the Domestic Defendants based upon principles of agency.

## **CLASS ALLEGATIONS**

96.     Plaintiff brings this action on their own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3).

> **Nationwide Class:**
>
> All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle. In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiff seek to represent the following state class only in the event that the Court declines to certify the Nationwide Class above.  Specifically, the state class consists of the following:
>
> **New York Class:**
>
> All persons or entities in New York who are current or former owners and/or lessees of a Class Vehicle for primarily personal, family or household purposes.

97.     Together, the New York Class and the Nationwide Class shall be collectively referred to herein as the "Class." Excluded from the Class are KMA, HMA, KMC, HMC and their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Class definitions based on discovery and further investigation.

98.    <u>Numerosity</u>:  Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis, alleges that hundreds of thousands of Class Vehicles have been sold and leased in each of the states that are the subject of the Class.

99.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, whether:

   a.  The Class Vehicles were sold with a defect;
   b.  Defendants knew of the defect but failed to disclose the problem and its consequences to its customers;
   c.  A reasonable consumer would consider the defect or its consequences to be material;
   d.  Defendants have failed to provide free repairs as required by its New Vehicle Limited Warranty and/or Powertrain Warranty;
   e.  Defendants should be required to disclose the existence of the defect; and
   f.  Defendants' conduct violates the California Legal Remedies Act, California Unfair Competition Law, New York General Business Law and the other statutes asserted herein.

100.    <u>Typicality:</u>  Plaintiff's claims are typical of the claims of the Class because Plaintiff and each Class member purchased a Class Vehicle with the same Engine Defect. Furthermore, Plaintiff and all Members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of herself and all absent Class Members.

101.     Adequacy:  Plaintiff is an adequate representative because her interests do not conflict with the interests of the Class that she seeks to represent, she has retained counsel competent and highly experienced in complex class action litigation, and she intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

102.     Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and Members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for Members of the Class individually to effectively redress the wrongs done to them. Even if the Members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, inter alia, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

103.     Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**
**("CLRA") (Cal. Civ. Code § 1750, et seq.)**
**(On Behalf of the Nationwide Class)**

104.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

105.    Plaintiff brings this claim on behalf of herself and on behalf of the Nationwide Class.

106.    KMA, HMA, KMC, HMC are "persons" as that term is defined in California Civil Code § 1761(c).

107.    Plaintiff and the Class Members are "consumers" as that term is defined in California Civil Code §1761(d).

108.    Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiff and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

> (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;
> (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;
> (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and
> (a)(9) Advertising goods and services with the intent not to sell them as advertised.

109.     Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

110.     Defendants knew that the Class Vehicles and Theta II Engines were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

111.     Defendants were under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles and the defective nature of the connecting rod bearings and insufficient engine oil lubrication systems because:

      a.  Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;

      b.  Plaintiff and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had dangerous safety defects until manifestation of the defect;

      c.  Defendants knew that Plaintiff and the Class Members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs that it causes until the manifestation of the defect; and

      d.  Defendants actively concealed the safety and security defect and the associated repair costs by asserting to Plaintiff and Class Members that the cause of the Class Vehicle engine problems was the result of the owners' failure to maintain the proper engine oil levels or follow the recommended

maintenance and service schedule despite knowing the repairs needed to correct the defect.

112.    The facts concealed or not disclosed by Defendants to Plaintiff and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price.  Had Plaintiff and the Class known about the defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles or would have paid less for them.

113.    Plaintiff's and the other Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

114.    Therefore, Plaintiff and the other Class Members seek all relief available under the CLRA.

<u>SECOND CAUSE OF ACTION</u>
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAWS**
**(Cal. Bus. & Prof. Code § 17200)**
**(On Behalf of the Nationwide Class)**

115.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

116.    Plaintiff brings this claim on behalf of herself and on behalf of the Nationwide Class.

117.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

118.    Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the Class Members that the Class Vehicles suffer

from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). Defendants should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiff and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

119.    The defective connecting rod bearings and insufficient engine oil lubrication systems constitute a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

120.    These acts and practices have deceived Plaintiff and are likely to deceive the public.  In failing to disclose the defect and suppressing other material facts from Plaintiff and the Class Members, Defendants breached its duties to disclose these facts, violated the UCL, and caused injuries to Plaintiff and the Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff and the Class Members, as it would have been to all reasonable consumers.

121.    The injuries suffered by Plaintiff and the Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff and the Class Members should have reasonably avoided.

122.    Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 et seq., and California Commercial Code § 2313.

123.    Plaintiff seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## THIRD CAUSE OF ACTION
## VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
### (Cal. Bus. & Prof. Code § 17500, et seq.)
### (On Behalf of the Nationwide Class)

124.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

125.    Plaintiff brings this claim on behalf of herself and on behalf of the Nationwide Class.

126.    California Business & Professions Code § 17500 states:  "It is unlawful for any . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

127.    Defendants caused to be made or disseminated through the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants to be untrue and misleading to consumers, including Plaintiff and the other Class Members.

128.    Defendants have violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of its Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

129.    Plaintiff and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiff and the other Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles. Defendants' representations were untrue because the Class Vehicles are distributed with defective connecting rod bearings and insufficient engine oil lubrication systems. Had Plaintiff and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiff and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

130.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

**131.**    Plaintiff, individually and on behalf of the other Class Members, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and the other Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

<u>**FOURTH CAUSE OF ACTION**</u>
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Nationwide Class and New York Class)**

132.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

33

133.    Plaintiff brings this claim on behalf of herself and on behalf of the New York Class against Defendants.

134.    Defendants provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

135.    Accordingly, Defendant's warranties are express warranties under state law.

136.    The parts affected by the defect, including the rotating assembly and engine block, were distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided to all purchasers and lessors of Class Vehicles.

137.    Defendants breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

138.    Plaintiff notified Defendants of the breach within a reasonable time, and/or were not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants also knew of the defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

139.    As a direct and proximate cause of Defendants' breach, Plaintiff and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the defective connecting rod bearings and insufficient engine oil lubrication systems.

140.    Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.

141.    Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

142.    The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and the Class Members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

143.    Plaintiff and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY
### (On Behalf of the Nationwide Class)

144.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

145.    Plaintiff brings this claim on behalf of herself and on behalf of the Nationwide Class. Alternatively, Plaintiff brings this claim on behalf of herself and on behalf of the New York Class against Defendants.

146.    Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

147.    Defendants provided Plaintiff and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, inter alia, the Class Vehicles and their engines suffered from defective connecting rod bearings and insufficient engine oil lubrication systems at the time of sale that causes the vehicles to experience premature and catastrophic engine failure. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

148.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

149.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the other Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

150.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## SIXTH CAUSE OF ACTION
### BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, et seq.)
### (On behalf of the Nationwide Class)

151.  Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

152.  Plaintiff brings this claim on behalf of herself and on behalf of the Nationwide Class. Alternatively, Plaintiff brings this claim on behalf of herself and on behalf of the New York Class against Defendants.

153.  Plaintiff and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

154.  Defendants are a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

155.   The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

156.  Defendants' 5 year/60,000 miles Basic Warranty and 10 year/100,000 miles Powertrain Warranty are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

157.  Defendants breached the express warranties by:

  a.  Providing a 5 year/60,000 miles Basic Warranty and a 10 year/100,000 miles Powertrain Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

    b.   Selling and leasing Class Vehicles with engines that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

    c.   Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, the engine or any of its component parts in order to remedy the defective connecting rod bearings and insufficient engine oil lubrication systems.

158.    Plaintiff and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

159.    Defendants breach of the express warranties has deprived Plaintiff and the other Class Members of the benefit of their bargain.

160.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

161.    Defendants have been afforded a reasonable opportunity to cure its breach of the written warranties and/or Plaintiff and the other Class Members were not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranties would have been futile. Defendants were also on notice of the alleged defect from the complaints and service requests it received from Class Members, as well as from its own warranty claims, customer complaint data, and/or parts sales data.

162.    As a direct and proximate cause of Defendants' breach of the written warranties, Plaintiff and the other Class Members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiff and the other Class Members, who

are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

**SEVENTH CAUSE OF ACTION**
**COMMON LAW FRAUD**
**(On Behalf of the Nationwide Class)**

163.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

164.    Plaintiff brings this claim on behalf of herself and on behalf of the Nationwide Class. Alternatively, Plaintiff brings this claim on behalf of herself and on behalf of the New York Class against Defendants.

165.    Defendants made material omissions concerning a presently existing or past fact. For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent defect with the Theta II Engine, which was not readily discoverable until years later, often after the New Vehicle Limited Warranty or the Powertrain Warranty has expired. As a result, Plaintiff and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said defect and all the resultant problems.

166.    These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiff and the Class Members rely on them.

167.    Plaintiff and the Class Members reasonably relied on these omissions, and suffered damages as a result.

### EIGHTH CAUSE OF ACTION
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (On Behalf of the Nationwide Class)

168.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

169.    Plaintiff brings this claim on behalf of herself and on behalf of the Nationwide Class. Alternatively, Plaintiff brings this claim on behalf of herself and on behalf of the New York Class against Defendants.

170.    All contracts in California contain an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

171.    Defendants breached the covenant of good faith and fair dealing by, inter alia, failing to notify Plaintiff and Class Members of the defective connecting rod bearings and insufficient engine oil lubrication systems in the Class Vehicles, and failing to fully and properly repair this defect.

172.    Defendants acted in bad faith and/or with a malicious motive to deny Plaintiff and the Class Members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
### VIOLATION OF THE SONG-BEVERLY ACT –
### BREACH OF IMPLIED WARRANTY
### (Cal. Civ. Code §§ 1792, 1791.1, et seq.)
### (On Behalf of the Nationwide Class)

173.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

174.     Plaintiff brings this claim on behalf of herself and on behalf of the Nationwide Class.

175.     At all relevant times hereto, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or should have known of the specific use for which the Class Vehicles were purchased.

176.     Defendants provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, inter alia, the Class Vehicles and their engines suffered from an inherent defect at the time of sale that causes the Class Vehicles to experience premature and catastrophic engine failure.

177.     The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the defect.

178.     Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use - providing safe and reliable transportation - while the Class Vehicles were being operated.

179.     Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose.

Instead, the Class Vehicles are defective, including, but not limited to, the Engine Defect and/or manufacture of the Theta II Engines.

180.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

**TENTH CAUSE OF ACTION**
**Asserted on Behalf of the New York Class**
**(Violations of § 349 of New York General Business Law: Deceptive Acts and Practices)**

181.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

182.    Plaintiff brings this action on behalf of a New York Class.

183.    NY GBL § 349 makes unlawful any deceptive act or practice, including false advertising, in the conduct of any trade or commerce or in the furnishing of any service in New York.

184.    Plaintiff purchased her Kia Optima in New York and brings this action pursuant to NY GBL § 349 on behalf of herself and all others similarly situated.  Plaintiff and members of the New York Class are consumers.

185.    Defendants have engaged in deceptive practices through omissions of the presence of defective vehicles in the assembled vehicles sold and the material facts directed at Plaintiff and members of the New York class as more fully described above, in connection with the sale of the vehicles that have defective parts that cause the vehicles to have engine failure. Defendants' omissions are likely to mislead and did materially mislead Plaintiff and other reasonable consumers by causing them to purchase the vehicles and to pay for undisclosed additional expenses that they would not have paid for but for Defendant's omissions.

186.    Defendants made numerous omissions of the material facts in its printed materials with the vehicles and which Plaintiff and members of the New York class saw and relied on to their detriment.  Consumer Representative Plaintiff and New York Class members relied on Defendants' Omissions of the presence of the Engine Defect in the Class Vehicles in that they would not have purchased the vehicles had Defendants disclosed to them that the vehicles contained a defective engine and related material information.

187.    The unfair and deceptive trade practices have directly, foreseeably and proximately caused damages and injury to Plaintiff and members of the New York class. Plaintiff and Class Members have lost money in that they would not have purchased the vehicles or would have paid less for them.  Plaintiff seeks to enjoin Defendants' deceptive conduct, as well as damages and attorneys' fees and all other relief available under NY GBL § 349.

### ELEVENTH CAUSE OF ACTION
**Asserted on Behalf of the New York Class**
**(Violations of § 350 of New York General Business Law: False Advertising Unlawful)**

188.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

189.    Plaintiff brings this action on behalf of a New York Class.

190.    NY GBL § 350 makes false advertising unlawful.

191.    Defendants' advertising of the vehicles, as alleged in more detail herein, is and was false within the meaning of NY GBL § 350-a(1).

192.    Plaintiff and Class Members were materially misled by Defendants' advertising.

193.    Plaintiff and Class Members relied on Defendants' omissions of material facts at the point of purchase where they purchased the vehicles in that they would not have purchased the vehicles had Defendants disclosed to them material facts.

194.    As a direct and proximate result of Defendants' false adverting, Plaintiff and Class Members lost money in that they would not have purchased the vehicles or would have paid less for them.

195.    Plaintiff seeks to enjoin Defendants' deceptive conduct as well as damages and attorneys' fees and all other relief available under NY GBL § 350.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and members of the Class, respectfully request that this Court:

A.  determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.  appoint Plaintiff as the representative of the Classes and her counsel as Class counsel;

C.  award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

D.  award pre-judgment and post-judgment interest on such monetary relief;

E.  grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the defective Theta II engines found in Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class Members with appropriate curative notice regarding the existence and cause of the Engine Defect;

F.  award reasonable attorneys' fees and costs; and

G.  grant such further relief that this Court deems appropriate.


Dated: January 19, 2018                    Respectfully submitted,


Jeffrey L. Koenig, Esq.
HECHT, KLEEGER & DAMASHEK, PC
19 West 44th Street
Suite 1500
New York, New York 10036
Tel:  212-490-5700
Fax: 212-490-4800



Austin B. Cohen, Esquire
Daniel C. Levin, Esquire
Charles E. Schaffer, Esquire
Keith Verrier, Esquire
LEVIN SEDRAN & BERMAN
510 Walnut Street, Ste. 500
Philadelphia, PA 19106
Tel: 215-592-1500
Fax  215-592-4663